UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
WAYNE CHREBET,

                         Plaintiff,                            **ORDER**
  -against-                                             09 CV 4249 (DRH) (AKT)

COUNTY OF NASSAU, PAUL SZYMANSKI,
BOHDAN PILCZAK, SCOTT TUSA, RICHARD
HERMAN, BRIAN FITZGERALD, ARNOLD
ROTHENBERG, RICHARD SOTO, KEVIN
LOWRY, and MICHAEL KRUMMENACKER,

                         Defendants.
----------------------------------------------------------X

**APPEARANCES:**

**For the Plaintiff:**

**SULLIVAN PAPAIN BLOCK MCGRATH & CANNAVO, P.C.**
1140 Franklin Ave.
Garden City, New York 11530
By:    Robert G. Sullivan, Esq.
         Brian J. Shoot, Esq.
         Matthew J. Jones, Esq.

**For the Defendant:**
**NASSAU COUNTY ATTORNEY**
One West Street
Mineola, New York 11501
By:    John Ciampoli, Esq.

**HURLEY, Senior District Judge:**

        Plaintiff Wayne Chrebet ("Chrebet") commenced this action against Nassau County ("the

County"), Nassau County Police Officers Richard Herman ("Herman"), Brian Fitzgerald

("Fitzgerald"), Arnold Rothenberg ("Rothenberg"), Richard Soto ("Soto"), Kevin Lowry

("Lowry"), and Nassau County Fire Marshals Paul Szymanski ("Szymanski"), Bohdan Pilczak

("Pilczak"), Scott Tusa ("Tusa"), and Michael Krummenacker ("Krummenacker") in Nassau

County Supreme Court. On October 2, 2009, defendants removed the action to federal court in the Eastern District of New York.

Plaintiff sets forth ten causes of action in the original Complaint. Count I alleges a due process claim brought under 42 U.S.C. § 1983 against the police officer defendants for depriving Plaintiff of his property interest in violation of the Fifth and Fourteenth Amendments. (Compl. ¶¶ 119–126.) Count II alleges a similar due process claim in violation of Article I, § 6 of the New York State Constitution. (*Id.* ¶¶ 127–135.) Count III asserts a due process claim under Section 1983 against the police officer defendants for deprivation of Plaintiff's liberty interest in violation of his Fifth and Fourteenth Amendment rights. (*Id.* ¶¶ 136–145.) Count IV sets forth a similar due process claim under Article I, § 6 of the New York State Constitution. (*Id.* ¶¶ 146–156.) Plaintiff's due process claims are premised on the theory that defendants "use[d] bogus raids and similar means to deliberately drive [plaintiff's] business into the ground." (Pl.'s Mem. in Opp'n at 9.) It is implied in plaintiff's submission that defendants behaved in this way in retaliation against plaintiff because of his business relationship with Matthew Prince ("Prince"), who had previously given grand jury testimony against other Nassau County police officers. (*Id.* at 17-18.)

In addition, Counts V and VI assert Section 1983 claims against the Nassau County Police Department supervisory defendants and the Nassau County fire marshal supervisory defendants under a theory of supervisory liability. (*Id.* ¶¶ 157–169; 170–193.) Moreover, Count VII contains a claim of municipal liability against the County. (*Id.* 183–193.)

Finally, plaintiff asserts several state tort claims. Count VIII consists of a tortious interference with business relations claim against the police officer defendants and defendant Nassau County. (*Id.* ¶¶ 194–201.) Count IX seeks recovery for intentional infliction of

emotional distress against the police officer defendants and Nassau County. (*Id.* ¶¶ 202–207.) Finally, in Count X, plaintiff alleges negligent supervision and/or negligent retention of employment services against Defendant Nassau County.[1] (*Id.* ¶¶ 208–215.)

Presently before the Court is defendants' motion for summary judgment on all of plaintiff's claims. For the reasons set forth below, defendants' motion is granted.

## BACKGROUND

The facts are taken from the parties' Local Rule 56.1 Statements and other evidentiary submissions.

At all times relative to the Complaint, defendants Szymanksi, Pilczak, Tusa, and Krummenacker all were employed by the Nassau County Office of the Fire Marshall. Tusa was a Division Supervisor from 1997 to 2010, Pilczak served as a Fire Investigator from 2006 until 2010, Krummenacker became a Fire Marshal in 1994, and Szymanksi became a Fire Marshal in 1996. In addition, at all relevant times, defendants Herman, Fitzgerald, Rothenberg, Soto, and Lowry were all employed by the Nassau County Police Department and worked in the First Precinct. Fitzgerald was a Lieutenant Desk Officer from December 2006 until July 2009, Soto became a Sergeant in December 2005, Rothenberg became a Sergeant in 2006, Herman became a Sergeant in 2006, and Lowry retired in October of 2010 as an Assistant Chief.

Plaintiff, before opening an upscale restaurant called *Chrebet's*, incorporated the entity *Chrebet's Inc.*, which transacted business as *Chrebet's*. Plaintiff was the registered agent and President of *Chrebet's Inc.* Plaintiff, personally and as President of *Chrebet's Inc.*, entered into a business consulting agreement with Prince. Under the agreement, Prince was to serve as a

---

[1] Plaintiff concedes that his negligent supervision/negligent hiring claim should be dismissed. (Pl.'s Mem. in Opp'n at 1.)

General Manager of *Chrebet's* and retained full control over the management and operation of *Chrebet's*. The agreement stated that it was to remain in full force and effect for such period of time until Prince became a shareholder in *Chrebet's Inc.* or until Prince voluntarily withdrew from his position.

*Chrebet's* opened in March of 2007. On April 28, 2007 Soto and two other police officers conducted what Soto referred to as a "routine" inspection of *Chrebet's*. They observed no violations, but told a manager on site that the liquor and occupancy licenses should be conspicuously posted on the wall. Plaintiff maintains that the liquor license was properly posted.

*June 14-15, 2007 Events*

*Chrebet's* opened a lounge area on or around June 14, 2007. According to defendant, on the evening of June 14, 2007, someone notified Fire Marshal Szymanksi of an overcrowding situation at *Chrebet's*, and Szymanski then notified Tusa and Pilczak of the complaint, after which each arrived on the scene. At 12:30 a.m. on June 15, 2007, Police Officer Soto responded to a call to assist the Fire Marshals at *Chrebet's* and also came to the scene. While waiting to speak with someone in charge, Szymanski and Pilczak performed a walk-through of the premises to check exits and visually observe the number of people in the establishment. Although Szymanski and Pilczak testified that *Chrebet's* was overcrowded, Prince testified that he did not believe that the restaurant was filled beyond capacity that night.

Plaintiff states that he was already at the door when Nassau County law enforcement officers arrived and that he immediately identified himself as the owner, however, defendants claim that plaintiff appeared only after Tusa asked for an agent in charge. According to plaintiff, the officers present repeatedly asked him "where is Matt Prince?" Tusa and Szymanski told plaintiff that they believed the premises were overcrowded and that there would have to be a

4

"count out" of patrons. The Police Department present assisted during the "count out" by sealing all of the exits. According to defendants, Tusa performed the "clicker count," while Szymanski performed the stick figure count on a tally sheet as patrons exited through the front door. Tusa and Szymanski found that 573 persons were at *Chrebet's*, even though the establishment's maximum occupancy was 330 people. Plaintiff was not allowed to make his own count or observe the count and disputes the accuracy of the count. Chrebet also testified that the security employees usually kept a count of how many persons came through the entrance, but he did not know if they kept a count that night. Szymanksi issued appearance tickets to *Chrebet's Inc.* d/b/a *Chrebet's* for an overcrowding violation and a purported issue with the patio gate exit; plaintiff signed the tickets to acknowledge receipt. *Chrebet's Inc.* d/b/a *Chrebet's* was prosecuted in connection with the tickets.

According to plaintiff, on that night in question the liquor license was posted behind the bar, and no one asked him to present any license. Soto testified that the required licenses were not properly displayed and that he informed plaintiff that this was not allowed. Soto, however, did not issue any tickets or summons for violations regarding the licenses, and he did not make a referral to the State Liquor Authority.

*June 21-22, 2007 Events*

At 12:40 a.m. on June 22, 2007, Soto was dispatched to *Chrebet's* in response to a call about a fight at the location. Plaintiff was not at *Chrebet's* at this time. Prince, who was present, testified that no fight occurred that night. Plaintiff claims that Prince introduced himself to Soto as soon as he arrived, but Soto claims that he was informed by a security manager that Prince was in charge and that this was the first occasion that he had heard Prince was connected to *Chrebet's*. It is undisputed that Prince told Soto he was a consultant and the person in charge

5

that evening. Soto asked Prince for his identification, for the liquor license, and the public assembly license. According to Prince, the licenses were posted, but according to Soto, the licenses were in a binder and not properly posted. Soto then went to his car to get his summons book to write up the violations and check Prince for any outstanding warrants. Soto discovered an open warrant for Prince, told him that he was under arrest, and another officer arrested Prince. Soto also issued Prince appearance tickets for the failure to display underage drinking and birth defect signage as well as the improper posting of the licenses.

*June 27, 2007 Meeting*

On June 27, 2007, Krummenacker attended a meeting at *Chrebet's* in order to discuss the Fire Marshal's activities. Joe Margiotta, a lawyer for *Chrebet's*, and plaintiff, among others, were also present at this meeting. Margiotta set up the meeting. Defendants assert that Krummenacker told plaintiff that the licenses and required signage must be properly posted and that the people who work the front door should know the occupancy load, although plaintiff denies the discussion of these subjects. Defendants claim that at the meeting plaintiff showed Krummenacker a binder containing the licenses and told Krummenacker that he did not want to mar the walls of *Chrebet's* by hanging the licenses. According to plaintiff, Krummenacker told him that he would continue to have problems if Matt Prince was involved in *Chrebet's*, although plaintiff does not recall who was the first person to bring up Prince's name. In addition, Margiotta said that Prince "had to go."

Officer Lowry was at *Chrebet's* during the meeting, but he did not sit at the table where the meeting was taking place. Plaintiff approached Lowry after the meeting and showed him around the premises. Plaintiff claims that he spoke with Lowry about Prince and that Lowry said Chrebet was doing the right thing in getting rid of him. Lowry testified that he did not recall

whether they discussed Prince on that occasion, but that he had two conversations with plaintiff regarding Prince, one in which plaintiff expressed that Prince was not diligent in operating the business and asked Lowry if he should get rid of Prince.

On October 9, 2007, plaintiff and Prince executed an agreement in which plaintiff agreed to pay Prince in order to terminate his rights in the consulting agreement. When asked at his deposition if he was obligated to pay Prince, plaintiff responded that it was "the right thing to do."

*Additional Events*

Herman testified that on November 9, 2007, at 2:51 a.m., he and other police officers were dispatched to *Chrebet's* after two persons claimed they were assaulted inside *Chrebet's* by the staff. Plaintiff was not present at *Chrebet's* on this occasion. Herman spoke to someone he believed to be an employee of *Chrebet's* who told him that the two individuals came back after closing and created a disturbance. While on the premises, Herman viewed surveillance footage of the incident, but the video was inconclusive. Herman asked to see the liquor license and public assembly license and found those documents to be in order.

On November 10, 2007, at approximately 1:20 a.m., Herman returned to *Chrebet's*, accompanied by other officers, representatives from the Town of Hempstead Buildings Department, Tusa, and other fire marshals. Plaintiff was not present on this occasion. Herman conducted a check of the premises and found that the *Chrebet's* staff was cooperative. Tusa and another fire marshal issued orders to *Chrebet's* to remove violations in connection with sprinkler head caps, draperies without fire resistance labels, and to maintain clear exits. The Town of Hempstead Building Department issued five tickets to *Chrebet's*.

On November 25, 2007, the Office of the Nassau County Fire Marshal performed an

emergency light test at *Chrebet's*, and *Chrebet's* passed the inspection.

On or about January 31, 2008, Herman was dispatched to *Chrebet's* in response to an assault on a bartender.

On March 3, 2008, Herman stated in an email that he was going to organize a bar detail involving the police, fire marshals, building inspectors, and state liquor authority for licensed premises checks of *Chrebet's* and other establishments. Herman chose to check *Chrebet's* because he had heard from a security employee at *Chrebet's* that it was employing a certain promoter that had caused large disturbances in the past. On March 8, 2008 Herman, Rothenberg, and seven other police officers, Szymanski, two building inspectors, and one SLA representative entered *Chrebet's*. Herman inspected the second floor and asked a female employee where Prince was working that night, but the female employee responded that Prince was not there. Plaintiff was not in attendance on this occasion. Szymanski issued an order to remove violations relating to the automatic fire extinguishing system. In addition, the Town of Hempstead Buildings Department issued a ticket for an obstructed exit.

On March 14, 2008, Herman and several other Nassau County police officers ticketed parked cars on streets next to and south of *Chrebet's* because they were illegally parked in violation of the posted signs. Plaintiff was not at *Chrebet's* on that day.

*Meeting of March 17, 2008*

On March 17, 2008, Wayne Chrebet, Sr., ("Chrebet Sr."), plaintiff's father, and Christopher Green ("Green"), plaintiff's business consultant, had a meeting with Fitzgerald and Rothenberg at the First Precinct at Chrebet Sr.'s request. Plaintiff did not instruct his father or Green to meet with the officers. Chrebet Sr. testified that he went to the meeting to speak with the police in an effort to get them to stop unfairly targeting *Chrebet's*. According to Chrebet Sr.,

Rothenberg said that they knew Prince was still working at *Chrebet's* and that if they wanted the raids to stop, they should send a letter to Prince notifying him that if he came to the restaurant he would be arrested for trespassing. On March 19, 2008, Chrebet Sr., on *Chrebet's Inc.* letterhead and identifying himself as a general manager, sent Prince a letter informing him that he could no longer come onto the premises.

*Events Leading to the Closing of Chrebet's*

On June 3, 2008, a *Chrebet's* employee called the Nassau County police to assist with a patron who injured a female bartender. Herman responded, but wrote no tickets.

On July 3, 2008, Rothenberg, Soto, and other police officers requested identification from *Chrebet's* patrons that were sitting on the side patio. Plaintiff was not present on that occasion.

*Chrebet's* closed in August of 2008.

## DISCUSSION

**I.     Legal Standard**

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could

find in the non-movant's favor. *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), and cannot rely on the allegations in his or her pleadings, on conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citations omitted). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., LP*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The district court, in considering a summary judgment motion, must also be mindful of the underlying burdens of proof because "the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, "the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the" non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers

evidence that the non-movant has failed to present sufficient evidence in support of his claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.'" *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

## II. *Plaintiff's Due Process Claims*

### A. **Plaintiff's Federal Due Process Claims**[2]

"In order to assert a violation of procedural due process rights, a plaintiff must 'first identify a property right, second show that the [government] has deprived him of that right, and third show that the deprivation was effected without due process.'" *DeFabio v. E. Hampton Union Free Sch. Dist.,* 658 F. Supp. 2d 461, 487 (E.D.N.Y. 2009) (quoting *Local 342, Long Island Pub. Serv. Emps., UMD, ILA, AFL–CIO v. Town Bd. of Huntington,* 31 F.3d 1191, 1194 (2d Cir. 1994)) (alteration in the original).

Here, plaintiff asserts that he "had a valuable property interest in his ownership of "*Chrebet's*," his business relationship with Matthew Prince, his reputation, and his status," and that as a result of defendants' actions he suffered a loss in past and future earnings, lost business opportunities, mental anguish, and psychological pain and suffering. (Complaint ¶¶ 120, 125.) Defendants argue, however, that plaintiff cannot demonstrate that he had "a unique personal property right or privilege belonging to him that was deprived by Defendants' alleged conduct."[3] (Defs.' Mem. in Supp. at 18.) In particular, defendants contend that plaintiff's alleged loss of

---

[2] Although the parties' submissions begin with a lengthy debate about whether plaintiff has standing to assert due process claims on behalf of *Chrebet's Inc.*, the Court will first address whether plaintiff has alleged any viable due process claims, and if so, it will then address whether he has standing to assert those claims.

[3] Plaintiff "agrees that he has failed to plead a claim against defendant Bohdan Pilczak and that Mr. Pilczak should therefore be granted summary judgment." (Pl.'s Mem. in Opp'n at 1.)

11

past and future earnings, loss of the severance money paid to Prince, and alleged damage to his reputation and status do not demonstrate that defendants deprived him of a property or liberty interest. The Court will examine each of plaintiff's asserted interests in turn below.

### 1. *Ownership of Chrebet's, Inc.*

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it ... He must, instead, have a legitimate claim of entitlement to it...." *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 577, (1972). The Supreme Court has determined that property interests "are not created by the Constitution." *Id.* "Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law ...." *Id.* The Second Circuit has also recognized that " 'property' protected by due process need not always flow from guaranty under state law or the Constitution." *Stein v. Bd. of the City of N.Y., Bureau of Pupil Transp.,* 792 F.2d 13, 17 (2d Cir. 1986). Furthermore, while the Supreme Court has recognized that "[t]he assets of a business (including its good will) unquestionably are property, and any state taking of those assets is unquestionably a 'deprivation' under the Fourteenth Amendment . . . business in the sense of *the activity of doing business*, or *the activity of making a profit* is not property in the ordinary sense." *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999).

In *San Jacinto Savings & Loan v. Kacal,* a case which predated *College Savings Bank* and which plaintiff cites in his opposition papers, an arcade owner sued the municipality alleging that patronage at her arcade and her resultant income had declined as a result of unjustified police harassment of her customers. *See* 928 F.2d 697, 699 (5th Cir. 1991). There the Fifth Circuit held that the plaintiff had a property interest in her business which was "essentially her

interest in the lost profits, which are sought merely as the measure of damages in this action." *Id.* at 704; *see also Callaghan v. Congemi,* 1992 WL 124809, at **3–4 (E. D. La. June 1, 1992) (relying on *San Jacinto Savings & Loan* in upholding due process claim brought by bar owner against municipality alleging that campaign of police harassment forced plaintiff out of business). Decisions by and within the Second Circuit indicate, however, that "the loss of a future business opportunity is not a protect[a]ble property interest." *Evac, LLC v. Pataki,* 89 F. Supp. 2d 250, 258 (N.D.N.Y. 2000) (citing *Asbestec Const. Servs., Inc. v. U.S. Envtl. Prot. Agency,* 849 F.2d 765, 770 (2d Cir. 1988) ("Mere opportunity to obtain a federal contract is not a property right under the due process clause.")); *cf. Sanitation & Recycling Ind., Inc. v. City of New York*, 928 F. Supp. 407, 420-21 (S.D.N.Y. 1996), *aff'd*, 107 F.3d 985 (2d Cir. 1997) (right to continue business on same terms as in the past is not a protectable property interest under the Due Process Clause). Furthermore, decisions within this Circuit indicate that allegations of harm to a plaintiff's "business operations" may not form the basis of a due process claim. *Murtaugh v. New York*, 810 F. Supp. 2d 446, 480 (N.D.N.Y. 2011) (finding that plaintiff's claim that defendants' actions effectively harmed plaintiff's business operations did not implicate a property interest for the purposes of a due process claim); *Tuchman v. Conn.*, 185 F. Supp. 2d 169, 174 (D. Conn. 2002) (finding that harm to "ability to conduct business" was not a deprivation of due process). In keeping with Second Circuit precedent, the Court will not recognize a protectable property interest in plaintiff's right to conduct his business and earn future profits from that business.

To the extent, plaintiff claims a property interest in the business assets of *Chrebet's*, any deprivation of those assets resulted in a harm to *Chrebet's, Inc.* and not plaintiff individually. Generally, a shareholder does not have standing to sue on behalf of the corporation for injuries

sustained to the corporation. *Potthoff v. Morin*, 245 F.3d 710, 717-18 (8th Cir. 2001) ("[A]ctions to enforce corporate rights or redress injuries to the corporation cannot be maintained by a stockholder in his own name.") (internal citations and quotation marks omitted). Although plaintiff does not contest this general rule, he argues that in some circumstances a "shareholder does have standing [to sue] where he or she has been injured directly and independently of the corporation." (Pl.'s Mem. in Opp'n at 11.) In particular, plaintiff argues that he experienced a direct and independent injury when he terminated the consulting agreement and decided to compensate Prince because he "was *personally* responsible for any breach of the consulting agreement by virtue of having personally signed the contract, and he thus suffered a direct loss that was distinct from his derivative loss as sole shareholder." (*Id*. at 12.) Nowhere in the agreement, however, is there a provision requiring *Chrebet's* or plaintiff personally to compensate Prince upon termination of the agreement. Moreover, when asked at his deposition whether he was obligated to compensate Prince, plaintiff made no mention of the consulting agreement and responded only that he "[j]ust decided it was the right thing to do." For the reasons stated above, plaintiff's due process claim predicated on his interest in *Chrebet's, Inc*. is dismissed.

### 2. *Business Relationship with Prince*

In *Prince v. County of Nassau*, 837 F. Supp. 2d 71 (E.D.N.Y. 2011), *aff'd* 2014 WL 1465379 (2d. Cir. Apr. 16, 2014), the Court in finding that Prince, the employee, had raised a genuine question of fact that he had a protectable property interest in his continued employment, noted that "[w]here the independent source of a property interest is a private contract, the state cannot transgress on the claim of entitlement to continued employment without due process of law." *Stein v. Bd. of the City of N.Y., Bureau of Pupil Transp.,* 792 F.2d 13, 17 (2d Cir. 1986)

*accord Int'l Union, Sec. Police, & Fire Prof'ls of Am. (SPFPA) v. U.S. Marshal's Serv.,* 350 F. Supp. 2d 522, 534 (S.D.N.Y. 2004) ("A collective bargaining agreement between a union and a private employer is a term of employment for the purposes of due process analysis even though the government entity is not a party to that contract."). The issue before the Court here is different in that plaintiff, the employer, claims that he had a protectable interest in his relationship with his employee, Prince, even where the employment contract allowed Prince to resign at any time. Plaintiff has not cited, nor is the Court aware of, any case where the court found that an employer had a property interest in the continued employment of his employee that would compel the survival of plaintiff's claim. As a result, plaintiff has not raised a genuine issue of fact that he had a protectable interest in a continued business relationship with Prince, and plaintiff's due process claims based on that relationship are dismissed.

### 3. *Reputation and Status*

It is axiomatic that a "person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983." *Patterson v. City of Utica,* 370 F.3d 322, 329–30 (2d Cir. 2004) (citing *Paul v. Davis,* 424 U.S. 693, 701, (1976)). Rather, a claim based solely upon a plaintiff's loss of reputation must be brought as a state law defamation claim, and cannot form the basis of a Section 1983 claim. *See Sadallah v. City of Utica,* 383 F.3d 34, 38 (2d Cir. 2004) ("Defamation ... is an issue of state law, not of federal constitutional law, and therefore provides an insufficient basis to maintain a § 1983 action.")

"Loss of one's reputation can, however, invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest." *Patterson,* 370 F.3d at

15

330. Such claims are referred to as "stigma plus" claims. *Sadallah,* 383 F.3d at 38. To succeed on a stigma plus claim, "a plaintiff must show (1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." *Id.* (internal quotation marks omitted). Defendants argue that plaintiff's due process claims fail because he has failed to provide any evidence supporting a stigma plus claim.

Plaintiff's due process claim based upon defendants' alleged deprivation of his purported liberty interest in his reputation and status must be dismissed because plaintiff has not raised a genuine issue of fact regarding the first element of a stigma plus claim. "The gravamen of 'stigma' as part of a due process violation is the making under color of law of a reputation-tarnishing statement that is *false.*" *Doe v. Dep't of Pub. Safety ex rel. Lee,* 271 F.3d 38, 47–48 (2d Cir. 2001), *rev'd on other grounds Conn. Dep't of Public Safety v. Doe*, 538 U.S. 1 (2003). Here, plaintiff has not pointed to any record evidence of statements made by the defendants that were "capable of being proved true or false," and this is fatal to any stigma plus claim. *See id.* at 48. As a result, his due process claims premised on damage to his reputation and status must fail.[4]

**B.  State Claims**

Defendants move to dismiss plaintiff's due process claims asserted under the Constitution of the State of New York. Defendants argue that "a finding of no violation of federal

---

[4] Given that the Court has dismissed plaintiff's due process claims, it will not address defendants' subsidiary arguments for summary judgment including, *inter alia*, that defendants conspired to violate his due process rights.

16

constitutional due process rights itself warrants dismissal of corresponding or parallel state law claims." (Defs.' Mem. in Supp. at 27.) Plaintiff does not controvert this assertion. Since plaintiff's procedural due process claims described above have been dismissed, his corresponding Article I, § 6 claim is also dismissed for the same reasons. *Coakley v. Jaffe*, 49 F. Supp. 2d 615, 628 (S.D.N.Y. 1999), *aff'd* 234 F.3d 1261 (2d Cir. 2000) ("[T]he conclusion . . . that the plaintiffs' federal . . . due process rights were not violated dictates the conclusion that the plaintiff's parallel rights under the state constitution were also not infringed.").

**III.**     *Municipal and Supervisory Liability*

A municipality may not be held liable under Section 1983 on a *respondeat superior* theory of liability for its employees' alleged constitutional violations. *See Monell v. N.Y. City Dep't of Soc. Servs.,* 436 U.S. 658, 691(1978); *Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir. 1995). A municipal entity may only be liable if the alleged conduct was undertaken pursuant to "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [its] officers" or a "governmental 'custom' even though such a custom has not received formal approval through [ ] official decisionmaking channels." *Monell,* 436 U.S. at 690–91. Since, however, plaintiff has failed to raise evidence of a constitutional violation, his municipal liability claim must also fail.

Similarly, plaintiff's claim of supervisory liability must fail. In order to claim personal involvement by a supervisor, a plaintiff must prove that "the defendant participated directly in the alleged constitutional violation." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995). Since plaintiff has not raised a genuine issue of fact as to the alleged due process violations, plaintiff's claim of supervisory liability also must fail.

**IV.** *Intentional Infliction of Emotional Distress*

In order to assert a claim for intentional infliction of emotional distress ("IIED") under New York law, a plaintiff must show: "(1) extreme and outrageous conduct, measured by the reasonable bounds of decency tolerated by society; (2) intent to cause or disregard or a substantial probability of causing severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Margrabe v. Sexter & Warmflash, P.C.,* 353 F. App'x 547, 550 (2d Cir. 2009) (quoting *Conboy v. AT & T Corp.,* 241 F.3d 242, 258 (2d Cir. 2001)) (internal quotation marks omitted). "The conduct at issue must transcend the bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community." *Id.* (internal quotation marks omitted). Generally, "courts are reluctant to allow recovery under the banner of intentional infliction of emotional distress absent a deliberate and malicious campaign of harassment or intimidation." *Id.* (internal quotation marks and alteration omitted).

While defendants urge that the applicable statute of limitations is a period of one year for intentional torts under NY CPLR § 215, plaintiff argues that the Court should apply the statute of limitations for a personal injury cause of action brought against a municipality which is one year and ninety days. According to defendants, applying the one year and ninety day period removes from the Court's consideration acts occurring prior to May 30, 2008, one year and ninety days prior to plaintiff's commencing this lawsuit in state court on August 28, 2009.[5] Plaintiff, however, contends that the Court employ the continuing tort doctrine which states that "claims

---

[5] Plaintiff presents only two events occurring after August 28, 2008: (1) On June 3, 2008, Officer Herman responded to a call from a *Chrebet's* employee asking for assistance regarding a patron who injured a female bartender; (2) On July 3, 2008, Rothenberg, Soto, and other police officers requested identification from *Chrebet's* patrons that were sitting on the side patio.

18

for IIED that allege a continuing pattern and practice of actionable behavior . . . provide an exemption from the statute of limitations where the 'last actionable act' of the alleged course of conduct falls within the statute of limitations." *Neufeld v. Neufeld*, 910 F. Supp. 977, 983 (S.D.N.Y. 1996).

Even assuming the more lenient statute of limitations applies, plaintiff's claim does not survive because he has not raised a genuine issue of fact concerning the fourth element of the claim. In particular, plaintiff has not directed the Court's attention to any evidence in his submissions suggesting that he suffered severe emotional distress. As such, his claim must fail.

**V.**     ***Tortious Interference with Business Relations***

Under New York law a plaintiff seeking to recover for tortious interference with business relations must allege "(1) there is a business relationship between plaintiff and a third party; [ ](2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses dishonest, unfair or improper means; and (4) the relationship is injured." *Goldhirsh Group v. Alpert,* 107 F.3d 105, 108–09 (2d Cir. 1997).

The parties agree that the statute of limitations for this tort is one year and ninety days. Defendants, however, argue that "because all of Plaintiff's allegations concerning the circumstances of the termination of Mr. Prince have not been brought before the expiration of the applicable statute of limitations, and because Plaintiff makes no additional allegations concerning Mr. Prince's termination regarding events which occur[ed] after May 30, 2008, Plaintiff's claim must be dismissed as untimely." (Defs.' Mem. in Supp. at 38.) According to plaintiff, however, the statute of limitations begins to run at the time of injury and not at the time of defendants' wrongful act. Plaintiff argues that since he did not suffer injury until his business

19

failed and he closed it in August of 2008, he properly commenced the action within a year and ninety days of that date. (Pl.'s Mem. in Opp'n at 38.)

In *Kronos v. AVX Corp.*, 81 N.Y.2d 90, 94 (1993), the New York Court of Appeals held that a tortious interference with business action "cannot accrue until an injury is sustained." There the court found that even though the plaintiff's contract was breached in 1984, the plaintiff's claim did not accrue until 1988 when it sustained economic damages. Applying that ruling here, plaintiff's claim accrued once he suffered economic hardship resulting from the termination of his contract with Prince. Although plaintiff claims that he did not experience harm until he closed his business in August of 2008, it is clear from the plaintiff's complaint and other evidence put forth in this case that plaintiff sustained economic injury at least as early as when he agreed to compensate Prince on October 9, 2007, more than a year and 90 days prior to the commencement of the action. (Complaint ¶ 198 (Defendants "forc[ed] plaintiff to expend a great amount of money to 'buy out' Matthew Prince from their business agreement.").) Since no reasonable fact finder could find that plaintiff first sustained injury in August of 2008, plaintiff's claim must fail. *See id.* at 97 (noting that claim was not barred where "facts alleged in the amended complaint [did] not require the inference, as a matter of law, that damages were suffered prior to 1988.")

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted.

**SO ORDERED.**

Dated: Central Islip, New York
June 5, 2014

/s/_
Denis R. Hurley
Unites States District Judge